***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On or about May 12, 2003, the date of the alleged injury by accident, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On said occasion, an employee-employer relationship existed between plaintiff-employee and defendant-employer. Defendant-employer is self-insured, with Compensation Claims Solutions as its servicing agent.
3. On the relevant dates herein, plaintiff's average weekly wage was $461.16, yielding a compensation rate of $307.46, as reflected on an Industrial Commission Form 22 Wage Chart.
4. In addition, the following were admitted into evidence: (a) plaintiff's medical records; (b) interrogatory answers; (c) transcript of plaintiff's recorded statement; (d) plaintiff's wage information; (e) internal investigation documents; and (f) Industrial Commission forms.
5. The issues before the deputy commissioner were: (a) whether plaintiff sustained a compensable injury by accident on or about May 12, 2003; and (b) if so, to what compensation, if any, is she entitled.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was forty-seven (47) years of age, with her date of birth being August 10, 1955. Plaintiff's work experience included twenty-eight (28) years as a licensed professional nurse (LPN), conducting community health education in a variety of clinical settings.
2. Plaintiff was employed by defendant-employer as a nurse at the Durham County Detention Facility. At the time of the hearing, plaintiff had worked in that capacity for approximately three years. Specifically, plaintiff's work as a nurse for defendant-employer was focused on the elimination or reduction of syphilis and other sexually transmitted diseases in the prison population. In this role, plaintiff's duties required her to speak with inmates regarding these types of diseases, with initial discussions usually taking place in the intake pod area of the facility. Through these discussions, plaintiff attempted to convince inmates to be tested. If an inmate signed up for the program, plaintiff later called the inmate to her office where she drew blood and provided further information. When plaintiff drew blood she wore gloves, disposed used needles in a certified container, and if there was any blood spilled, cleaned the spill with appropriate chemicals. Plaintiff did not "have contact with anything other than blood," which was drawn in a controlled setting from inmates who have volunteered for her services.
3. The intake pod is a large open area in the Durham County Detention Facility where detainees are held while being classified. The intake pod is supervised by one detention officer. Two to three additional detention officers work in the intake pod area classifying detainees.
4. On May 12, 2003, plaintiff was working in the intake pod at the downtown Durham County Detention Facility. As was her daily practice, plaintiff mixed among the general inmate population, identifying inmates for education and testing. On this day, while in the intake pod, plaintiff encountered inmate Michael Whitley.
5. Mr. Whitley approached plaintiff and asked her in a loud tone of voice who was she, what she was doing there, and was she a nurse. Plaintiff responded to Mr. Whitley's questions and to those of other inmates. Mr. Whitley became more agitated and loud. He accused plaintiff of ignoring ("iggin') him. Mr. Whitley came closer to plaintiff, within a distance of approximately one and one-half feet. Plaintiff had never seen Mr. Whitley before and was surprised that the detention officer on duty allowed him to yell and openly display such agitated behavior. Mr. Whitley was yelling at plaintiff, jumping around and shaking as if he were having a seizure. Mr. Whitley started rubbing his stomach and plaintiff could not determine what he was doing. Mr. Whitley, who was wearing a colostomy bag, suddenly spewed its content of urine and feces onto plaintiff. From the record, it does not appear plaintiff knew or saw that Mr. Whitley was wearing a colostomy bag.
6. Plaintiff testified, "The next thing I knew is I felt wet, particularly on my stomach area, and at first, I thought maybe he stabbed me and, I just wasn't having any pain because deep wounds sometimes you, don't initially feel pain or if you're in shock." Plaintiff looked down and saw a brownish liquid on her stomach, legs, shoes, arm, and hand. By that time Mr. Whitley had gotten closer and she told him twice to "back up." Mr. Whitley stepped back and said, "Yeah, I got you."
7. Plaintiff reported the incident to the officer and went to her office to try to figure out what to do "because it wasn't registering with me." She testified that she went to the medical unit to wash her hands. When she came from washing her hands, Kelly, the psychiatric social worker and several other nurses had gathered. Kelly told plaintiff, "You need to see the magistrate. That's an assault." Plaintiff stated she just wanted to get out of there, but Kelly and the other nurses said, "No." Kelly then told plaintiff, "You need to go home. As soon as you're done, you need to go home. You know you're just not yourself right now." Another nurse told plaintiff Mr. Whitley was HIV positive. On the instructions of Kelly and the other nurses, plaintiff went to the magistrate to report the assault.
8. Plaintiff thought meeting with the magistrate to file assault charges would be a "few minute procedure," but had to wait approximately two and one-half hours to give a statement before she could go home. She testified, "That was a difficult thing to do because all I wanted to do was is go home you know. I can't I think I was somewhat in shock at that point, so I was just sort of numb." At first she could not remember her address or social security number.
9. Because of her immediate focus on filing criminal charges, plaintiff did not follow defendant-employer's normal protocol when a person is exposed to potentially harmful substances, which is to inform a supervisor and report to Durham Regional Hospital. Given the extraordinary nature of the event in question, the Full Commission finds that plaintiff's failure to follow protocol does not indicate that she was not psychologically harmed by the assault.
10. Defendant's argument that plaintiff never felt physically threatened by Mr. Whitley is given little weight. Plaintiff immediately after the assault thought she was stabbed. The inmate continued to approach her and she had to twice tell him to back off. Immediately after the assault, plaintiff felt she was in a state of shock. Plaintiff's co-worker Kelly, told plaintiff that plaintiff was not herself.
11. When plaintiff got home, she bleached her clothes and shoes in the washing machine. She then washed herself for an hour and twenty minutes. Plaintiff felt "dirty and defiled." Plaintiff did not return to work that day. The next morning, she felt she just could not get out of bed. She felt really tired. After dragging around tired and being unable to return to work for three or four days, plaintiff's husband insisted that she seek medical attention.
12. On 16 May 2003, plaintiff was examined by her family physician, Dr. Jane Murray. When Dr. Murray came into the room, plaintiff began sobbing, she could not talk enough to tell the doctor what happened for about thirty minutes. Dr. Murray noted that the incident at work had triggered Post Traumatic Stress Disorder (hereinafter PTSD), prescribed Xanax and recommended that plaintiff see a psychiatrist right away. Plaintiff called a psychiatrist after returning from the doctor, but was informed that the psychiatrist would not take insurance.
13. On Monday, one week after the assault, plaintiff called her supervisor Cheryl Scott and told her she needed to see a psychiatrist and someone from the Employee Assistance Program (EAP). Cheryl Scott told plaintiff that she and Sue Guptal, Cheryl Scott's supervisor, needed a statement from plaintiff before they could recommend anything. At the time, plaintiff became aggravated because she could not concentrate, she could not do anything and she knew she could not give a statement.
14. With the assistance of her husband, plaintiff called the EAP and was referred to Dr. Deborah McFarlane, a psychologist. On 20 May 2003, plaintiff met with Dr. McFarlane, for a comprehensive intake evaluation. Plaintiff testified that she reported to Dr. McFarlane, "I'm just not myself. I'm not like this. I'm a tough person. I get over things." Plaintiff "couldn't understand why I just couldn't get a hold of this." Ongoing therapeutic treatment followed, and upon Dr. McFarlane's recommendation, plaintiff met with Dr. Roger Perilstein on June 9, 2003, for psychiatric treatment and medication management.
15. Plaintiff presented to Dr. McFarlane with symptoms of guilt about her family needing to take care of her, belief that she should be doing better, withdrawal from her family, and feeling safe only at home. Dr. McFarlane initially assessed plaintiff as hyperstartled and hypervigilant. After plaintiff completed testing on November 28, 2003, Dr. McFarlane diagnosed plaintiff with depression, anxiety and acute stress disorder, which evolved into PTSD.
16. As of the date of Dr. McFarlane's deposition (February 19, 2004), she had completed fourteen 45 — 50 minute sessions with plaintiff. Her diagnosis of plaintiff remains the same, although plaintiff's ability to function has greatly improved. Plaintiff will require continued treatment in the form of counseling and medication management. Dr. McFarlane gave the opinion that plaintiff's PTSD was caused by the work-place assault on May 12, 2003.
17. After the assault, plaintiff was fearful and nervous about being at home or going out unless she was with her husband. She could not concentrate, was forgetful and could not read. Plaintiff also was depressed and having flashbacks of the incident involving Mr. Whitley. For a while, plaintiff's children took turns watching her while her husband was at work.
18. Plaintiff testified that on one occasion, she attempted to go to the grocery store alone to shop. There she saw a middle-aged man who sort of resembled Mr. Whitley. Plaintiff hurriedly left her cart and walked out of store in such a haste that she inadvertently left her keys in the cart upon fleeing the store.
19. After the assault, plaintiff did not feel safe outside her house. On another occasion, plaintiff was swimming in her pool when she became concerned regarding how quiet the neighborhood seemed. Plaintiff could not "hear anything." She thought, "Somebody could be out there." Plaintiff started to talk herself out of going into the house, saying, "this is stupid," but returned to inside the house anyway saying to herself, "No. I'm going in the house with my dogs." Plaintiff had two big dogs, and felt safe inside with them.
20. Prior to the assault, plaintiff previously had been physically abused by a first husband and raped by him after they separated in the 1980's. Plaintiff did not seek counseling for these incidents. Plaintiff was also raped in the 1980's in an incident she described as similar to a "date rape,' but did not testify whether see received counseling for this incident.
21. Plaintiff presented to Dr. Perilstein with symptoms of anxiety including limited attachment to family members, difficulty in experiencing joy, jumpiness, and being easily startled. On the issue of causation, Dr. Perilstein has opined that the May 12, 2003 assault was not merely a significant contributing factor to the development of her PTSD, but rather was the primary factor in plaintiff developing this disabling condition. Although plaintiff had previously been assaulted and involved in an abusive marriage, Dr. Perilstein was of the opinion that plaintiff did not have PTSD symptoms before the May 12, 2003 assault. Dr. Perilstein testified that although plaintiff has returned to work, she still has panic attacks.
22. Dr. Perilstein and Dr. McFarlane medically excused plaintiff from work through the summer of 2003. Over the protestations of Dr. Perilstein and Dr. McFarlane, plaintiff returned to work for defendant-employer in her same position earlier than recommended on September 15, 2003. Plaintiff made the decision to return because she did not want to let Mr. Whitley win.
23. Previous to her return to work, plaintiff could not even drive by the jail. On the first day of plaintiff's return to work, Kelly walked into the jail with plaintiff. As of the date of the hearing before the deputy commissioner, plaintiff had not been able to go into the intake pod were the assault occurred. Plaintiff stated her inability to go into that pod is "sort of stupid because they all pretty much look the same, but I just I just can't do it right now, so I'm working with Dr. McFarlane on that."
24. In this case, defendants contend that the assault upon plaintiff was not an accident because it is not unusual or unexpected for a nurse working in a prison facility "to come into contact with bodily fluids or an unruly inmate." Defendants contend these circumstances are foreseeable as part of the normal work routine of a nurse in a prison setting. Defendant presented testimony from several witnesses in support of this contention.
25. Cheryl Scott testified that she has been a nurse for twenty-two (22) years with a work history of having worked with psychotic and substance abuse patients. In her current position, Ms. Scott did not provide clinical treatment at the Durham County Detention Facility. In the past, Ms. Scott had experienced inmates acting aggressive. She had been spit on, kicked in the head and had bodily fluids thrown on or at her. The above-described encounters did not occur at the Durham County Detention Facility. Ms. Scott testified that based on her experience as a clinical nurse and knowing the duties of the nurses at a jail, it was foreseeable that a nurse may come into contact with bodily fluid during the course of a nurse's normal duties, and may come into contact with inmates who may act aggressively. Ms. Scott also testified that Mr. Whitley's type of contact with a nurse (spewing the contents of a colostomy bag onto a nurse employed by the jail) was indicative of "the type of acting out that certain inmates are capable of at the jail."
26. Susan Guptal testified that she is the Director of Nursing at the Durham County Health Department. Ms. Guptal had been a nurse for twenty-eight (28) years including working in clinical settings. Ms. Guptal visited the Durham County Detention Facility occasionally. Based on her experiences and understanding of Durham County Detention Facility nurse duties, she testified it was foreseeable that those nurses, including plaintiff, may come into contact with bodily fluids during the course of their normal job routine and may come into contact with inmates who may act aggressively. Ms. Guptal also testified that Mr. Whitley's type of contact with a nurse (spewing the contents of a colostomy bag onto a nurse employed by the jail) was foreseeable within the jail setting.
27. Gayle Harris testified that she is the Assistant Director of Public Health employed with the Durham County Health Department. Ms. Harris had been a nurse for thirty-two (32) years with a work history including clinical experience. Ms. Harris was familiar with the duties of the nurses at the Durham County Detention Facility. Ms. Harris agreed, "this event [involving plaintiff] is foreseeable within the course and scope of the duties of a nurse at the jail."
28. Little weight is accorded to the opinions of Cheryl Scott, Susan Guptal and Gayle Harris in determining whether plaintiff sustained an injury by accident. Plaintiff's employment throughout her three (3) years at the Durham County Detention Facility was in the area of community health education. Her job duties with defendant-employer were different from those of nurses as medical providers in a regular jail or prison setting. Plaintiff's regular work routine with defendant-employer involved communicating with inmates to ascertain whether they were willing to talk to her and encouraging interested inmates to participate in a voluntary program where they would be tested for and provided information about sexually transmitted diseases. Plaintiff's job duties did not include being assaulted or physically threatened by inmates, having bodily fluid spewed all over her by inmates, unexpectedly coming into direct contact with the bodily fluids of an HIV positive inmate or the expectation that she would have to handle these types of situations. The Full Commission finds that at the time of the assault, plaintiff experienced an interruption of her normal work routine and the introduction of unusual conditions likely to result in unexpected consequences. The type of assault plaintiff experienced was unexpected and not reasonably foreseeable considering plaintiff's job duties as a health education nurse. The assault upon plaintiff constituted an accident within the meaning of N.C. Gen. Stat. § 97-2(6).
29. As a result of the May 12, 2003 assault, plaintiff developed anxiety, depression and PTSD. On May 12 2003, plaintiff was confronted with a traumatic event that she initially perceived as life threatening when she thought she had been stabbed and which Dr. Perilstein diagnosed as a threat to her physical integrity. Dr. Perilstein and Dr. McFarlane are of the opinion and the Full commission finds that plaintiff developed anxiety, depression and PTSD as a result of the May 12, 2003 assault upon her while working for defendant-employer. On May 12, 2003, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
30. As a result of her injury by accident, plaintiff was incapable of working in any capacity from May 13, 2003 to September 15, 2003. As of the date of hearing, plaintiff had not reached maximum medical improvement.
31. The treatment provided to plaintiff by Dr. McFarlane, Dr. Perilstein, Dr. Murray and others for her anxiety, depression and PTSD, was reasonably related to her injury by accident and was reasonably required to effect a cure, provide relief and lessen her disability.
32. Plaintiff's average weekly wage was $461.16, yielding a compensation rate of $307.46
33. Defendants defense of and actions in this claim were not unreasonable, unfounded or indicative of stubborn, unfounded litigiousness.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 12, 2003, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer as a result of an assault upon her by an HIV positive inmate who spewed urine, feces and other bodily fluids from a colostomy bag he was wearing, upon plaintiff.
2. Plaintiff's regular work routine for defendant-employer did not include being assaulted by inmates, feeling physically threatened by inmates or having bodily fluids spewed upon her, unexpectedly, by an HIV positive inmate. Calderwood v. Charlotte-Mecklenburg Hospital Authority,135 N.C. App. 112, 116, 519 S.E.2d 61, 63 — 64 (1999) (citations omitted) ("The fact that her job responsibilities did include assisting patients who received epidurals resulting in a total block is not dispositive. The question is whether her regular work routine required lifting the legs of women weighing 263 pounds who had received epidurals resulting in total blocks, and there is no evidence that it did."). The assault occurring on May 12, 2003, constituted an introduction into plaintiff's work routine of unusual conditions likely to result in unexpected consequences and thus constituted an accident within the meaning of N.C. Gen. Stat. § 97-2(6).
3. As the result of her May 12, 2003 injury by accident, plaintiff developed anxiety, depression and PTSD for which she has and will continue to require medical and psychological treatment. Plaintiff's PTSD, anxiety and depression were causally related to her compensable injury by accident. N.C. Gen. Stat. §§ 97-25; 97-2(6).
4. As the result of her May 12, 2003 injury by accident, plaintiff is entitled to be paid by defendants total disability compensation at the rate of $307.46 per week for the period of May 13, 2003 to September 15, 2003. N.C. Gen. Stat. § 97-29.
5. As the result of her May 12, 2003 injury by accident, plaintiff is entitled to have defendants pay for all related medical expenses incurred or to be incurred, including past and ongoing treatment provided by Dr. Perilstein and Dr. McFarlane. N.C. Gen. Stat. §§ 97-25; 97-25.1.
6. Defendants defended this matter on reasonable grounds, as there were legitimate issues for hearing. N.C. Gen. Stat. § 97-88.1; Sparks v.Mountain Breeze Restaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the rate of $307.46 per week for the period from May 13, 2003 to September 15, 2003. This compensation having accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay for all related medical expenses incurred or to be incurred by plaintiff as the result of her May 12, 2003 injury by accident, including past and ongoing treatment provided by Dr. Perilstein and Dr. McFarlane.
3. Defendants shall pay to plaintiff's attorney a reasonable attorney fee in the amount of 25% of the compensation awarded plaintiff herein. The attorney fee shall be deducted from the compensation due plaintiff and paid directly to plaintiff's attorney.
4. Plaintiff's entitlement to additional compensation (if any) is reserved for subsequent determination.
5. Defendants shall pay the costs.
This the ___ day of June 2005
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN